**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HOT SPRINGS DIVISION**

**MICKEY THOMAS, JR.**                                                                    **PETITIONER**

**V.**                              **CASE NO. 6:14-CV-6038**

**WENDY KELLEY, Director,**
**Arkansas Department of Correction**                                        **RESPONDENT**

## MEMORANDUM OPINION AND ORDER

Mickey Thomas, Jr. is an inmate in the Arkansas Department of Correction under

a death sentence for the 2004 murders of Donna Cary and Mona Shelton.   Thomas has

petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### I.   Procedural History

On September 28, 2005, following a jury trial in Pike County, Arkansas, Thomas

was convicted of the murders of Donna Cary and Mona Shelton and was sentenced to

death.   Thomas appealed his convictions to the Arkansas Supreme Court, setting forth

the following grounds for reversal on appeal:

1. That the trial court erred by transferring the trial to a county with a substantially
   smaller population of persons of Thomas's race;

2. That the trial court erred in failing to grant Thomas's motion to expand the jury
   pool;

3. That the Arkansas death-penalty sentencing scheme is unconstitutional
   because it fails to guide the jury in the exercise of its discretion during
   sentencing, or, alternatively, the statutory scheme, as applied in Thomas's
   case, violated his rights under the Eighth and Fourteenth Amendments;

4. That the trial court erred by failing to grant Thomas's motions to prohibit victim-
   impact evidence;

1

5. That the trial court abused its discretion in refusing to grant Thomas's requests for a continuance;

6. That the trial court erred by giving a jury instruction which imposed a non-statutory burden on Thomas to prove that mitigating circumstances "probably exist."

In a published opinion, <u>Thomas v. State</u>, 257 S.W.3d 92 (Ark. 2007), the Arkansas Supreme Court affirmed the convictions.   Thomas petitioned the Supreme Court of the United States for a writ of certiorari, which was denied in <u>Thomas v. Arkansas</u>, 552 U.S. 1025 (2007).

Following denial of certiorari, attorney Jeff Harrelson was appointed to represent Thomas in state post-conviction proceedings.   Thomas filed a petition for post-conviction relief, pursuant to Arkansas Rule of Criminal Procedure 37.5, in the Circuit Court of Sevier County, Arkansas.   After an evidentiary hearing, the circuit court denied relief on the Rule 37.5 petition.

Thomas appealed to the Supreme Court of Arkansas arguing that the circuit court's order denying relief should be reversed for the following reasons:

1. Because he was denied the effective assistance of counsel when his trial counsel failed to object to the trial court's change of venue to Pike County, which has a substantially smaller population of African Americans; and

2. Because he was denied the effective assistance of counsel when his trial counsel failed to introduce the testimony of Lt. Alex Mathis at trial, or at least offer his transcribed testimony from a pre-trial hearing to rebut an inference that Thomas may have contemplated raping or sexually assaulting the victims because he possessed a condom and twine when he was arrested.

The Supreme Court of Arkansas denied relief, rejecting Thomas's arguments. <u>See Thomas v. State</u>, 431 S.W.3d 923 ( Ark. 2014).

2

Thomas then filed a petition for writ of habeas corpus relief pursuant to 28 U.S.C. § 2254 in this Court, and ultimately amended that petition on April 29, 2014.   (Petition, Doc. 2; Amended Petition, Doc. 9).   Following an expansion of the record with respect to Thomas's ineffective assistance of counsel claims (Order, Doc. 35) and an initial Case Management Hearing, the Court determined that an evidentiary hearing was appropriate under Martinez v. Ryan, 132 S.Ct. 1309 (2012) and Trevino v. Thaler, 133 S.Ct. 1911 (2013) with respect to the claims set forth in Appendix A. (Orders, Doc. 39, 40).   An evidentiary hearing was held the week of January 30, 2017.   The instant order is in response to Thomas's amended petition, the Respondent's answer to the amended petition, the parties' subsequent pleadings, and the evidence presented in the evidentiary hearing.

For the reasons set forth below, the Court **GRANTS IN PART** the Amended Petition with respect to Issue 10-1, and **DENIES IN PART** the Amended Petition with respect to all other claims.

## II.  Facts

In adjudicating Thomas's direct appeal, the Supreme Court of Arkansas set forth a summary of the presented evidence.   Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct."   Although this presumption may be rebutted by Thomas, the Court finds that Thomas has not done so.   Thus, as determined by the Supreme Court of Arkansas, certain facts are as follows:

> On June 14, 2005, DeQueen Police found the bodies of two women at Cornerstone Monument Company after receiving a call about a possible

3

break in. Mona Shelton, the owner of the company, had been beaten and shot once in the head. Donna Cary, a customer, had been shot once in the head at close range. Police received a report of a black male with a white bag walking away from the front of Cornerstone Monument Company and getting into a pewter or copper-colored Ford Mustang with an Oklahoma license plate. Police broadcast this description to area law enforcement officers, and at 11:27 a.m., Trooper Jamie Gravier of the Arkansas State Police spotted the Mustang traveling west near the Oklahoma–Arkansas border.  Gravier attempted to stop the vehicle, and a high-speed chase ensued into Broken Bow, Oklahoma.

Oklahoma police ultimately located the vehicle parked behind the Broken Bow residence of Hazel Thomas, [Thomas's] mother, but the driver had already left the area. That same afternoon, police received a report that a black male with a gun had just stolen a Broken Bow resident's Mercury Cougar. The Oklahoma authorities spotted the vehicle, and they were able to apprehend [Thomas].

[Thomas] waived extradition to Arkansas and was charged in Sevier County with two counts of capital murder in the deaths of Mona Shelton and Donna Cary. The case was transferred to Pike County where [Thomas] was convicted of two counts of capital murder and was given a sentence of death for each count.

. . . .

[T]hree aggravating circumstances were presented by the State: (1) that [Thomas] previously committed another felony, an element of which was the use or threat of   violence to another person or created a substantial risk of death or serious physical injury to another person; (2) that in the commission of the capital murder, [Thomas] knowingly caused the death of Mona Shelton and Donna Cary in the same criminal episode; and (3) that the capital murder was committed for pecuniary gain. [Thomas] provided evidence of thirty-two separate mitigators, twenty-five of which one or more members of the jury found to exist.

Thomas v. State, 257 S.W.3d 92, 95-96, 100 (Ark. 2007).   Additional particular facts will be referenced herein as they relate to the individual grounds for relief raised by Thomas.

### III.   Standard of Review

#### A.   Exhaustion

As a matter of comity, before a federal court can grant habeas relief, it must first determine that the petitioner has exhausted all of his state court remedies.   According to Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." "[A] claim has not been fairly presented to the state courts unless the same factual grounds and legal theories asserted in the prisoner's federal habeas petition have been properly raised in the prisoner's state court proceedings." Krimmel v. Hopkins, 56 F.3d 873, 876 (8th Cir. 1995).

Finally, where it is more efficient to do so, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."   28 U.S.C. § 2254(b)(2).   See also Russell v. State of Mo., 511 F.2d 861, 863 (8th Cir. 1975).

#### B.   Procedural Bar

In addition to the requirement of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.   "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009)(quoting Coleman).   "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to

5

meet a state procedural requirement." Coleman, 501 U.S. at 729-30.  A "habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of the opportunity to address those claims in the first instance." Id. At 732.

A claim can be lost to procedural default at any level of state court review:  at trial, on direct appeal, or in the course of state post-conviction proceedings. Kilmartin v. Kemna, 253 F.3d 1087, 1088 (8th Cir. 2001); see also Noel v. Norris, 194 F.Supp.2d 893, 903 (E.D. Ark. 2002).

Once a claim is defaulted, the habeas court can only consider the claim if the petitioner can show cause for the default and actual prejudice, or that the default will result in a fundamental miscarriage of justice. Sawyer v. Whitley, 505 U.S. 333, 338-39 (1992). "[T]he cause standard requires the petitioner to show that some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." McCleskey v. Zant, 499 U.S. 467, 493 (1991)(internal quotations and citations omitted).  Examples of cause include constitutionally ineffective assistance of counsel, an unavailable factual or legal basis for a claim, or interference by state officials that made complying with the exhaustion requirements impracticable. Murray v. Carrier, 477 U.S. 478, 488-89 (1986). The petitioner must also show that the errors not only created *possible* prejudice, "'but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" 477 U.S. at 494 (quoting United States v. Frady, 456 U.S. 152, 170(1982).  A habeas court may bypass complex procedural issues if it is more efficient: "judicial economy sometimes dictates reaching the merits if the merits are easily

6

resolvable against a petitioner while the procedural bar issues are complicated." Barrett
v. Acevedo, 169 F.3d 1155, 1162 (8th Cir. 1999). See also Trussell v. Bowersox, 447
F.3d 588, 590-91 (8th Cir. 2006).

### C.    Merits

Finally, when the merits of a claim presented in a habeas action have been
addressed in state court proceedings, the habeas court cannot grant habeas corpus relief
upon the claim unless it determines that the state court proceedings resulted in a decision
(1) "that was contrary to, or involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United States" or (2) "that was
based on an unreasonable determination of the facts in light of the evidence presented in
the State court proceeding." 28 U.S.C. § 2254(d).

To find that a decision is contrary to clearly established federal law, a habeas court
must find that the state court decision directly contradicts Supreme Court precedent or if,
when faced with "materially indistinguishable" facts, the state court reached a decision
that was opposite to the result reached by the Supreme Court. Kinder v. Bowersox, 272
F.3d 532, 537-38 (8th Cir. 2001). With respect to the reasonableness requirement, the
petitioner must show that the state court decision is "objectively unreasonable." Williams
v. Taylor, 529 U.S. 362, 409 (2000)(O'Connor, J., concurring in part). Although a state
court's application of federal law might be mistaken in this Court's independent judgment,
that does not mean that it is objectively unreasonable. Id. at 411-13. Relief is warranted
only "where there is no possibility fairminded jurists could disagree that the state court's

decision conflicts with [the Supreme Court's] precedents." Harrington v. Richter, 562 U.S. 86, 102 (2011).

## IV. Claims

Before the Court is Thomas's amended petition (Amended Petition, Doc. 9), and the various responses and replies thereto.  As the Court previously ordered, some of Thomas's claims required further development.[1]   In this section, however, the Court will address the claims which this Court can resolve on the pleadings.

### A.   Claims for Relief Presented to the State Courts

Thomas failed to present the majority of his current claims to the state courts. However, the claims that were effectively presented to the state courts will be addressed in this section.

#### 1.   Issue 1-6: Failure to Introduce the Testimony of Lt. Alex Mathis at Trial.[2]

Thomas claims he was denied effective assistance of counsel when his trial counsel unreasonably and prejudicially failed to introduce the testimony of Lt. Alex Mathis at trial or to at least offer his transcribed testimony from a pre-trial hearing to rebut any

---

[1] Initially, the Court ordered that the record be expanded with regard to certain claims so that it might properly consider whether there was an excuse to certain procedural defaults.  (Order, Doc. 35).  To be clear, the expanded record was not considered for any other purpose.

As set forth in this Court's Order dated September 16, 2015 (Order, Doc. 40), the Court then held an evidentiary hearing concerning the procedural default of certain claims concerning ineffective assistance of counsel arising from the alleged failure to present compelling mental health and mitigation evidence and certain claims that trial counsel was ineffective for failing to investigate and present claims of juror misconduct.   Appendix A to this Order sets forth the claims taken up at the evidentiary hearing.

[2] Among other places, Issue 1-6 is discussed in the following pleadings:   Document 9, p. 53; Document 24, p. 30; and, Document 29, p. 50.

possible inference that Mickey Thomas attempted to rape or sexually assault the decedents because a condom and twine were found on his person upon his arrest.

Thomas claims that the testimony of Lt. Alex Mathis could have rebutted any inference that Thomas sexually assaulted or attempted to sexually assault the decedents. Although the State argues that this Court must deny relief under § 2254(d) because the Arkansas Supreme Court reasonably determined that trial counsels' failure to present the testimony of Lt. Mathis was a matter of trial strategy, Thomas asserts that § 2254(d) does not bar relief because the Arkansas Supreme Court's decision was based on an unreasonable determination of the facts.   Specifically, Thomas argues that according to the trial record, trial counsel discussed specific topics he originally intended to question Lt. Mathis about.   Thomas argues this proves that trial counsel's failure to call Mathis to testify was not a strategic decision.

As set forth above, when the merits of a claim presented in a habeas action have been addressed in state court proceedings, the habeas court cannot grant relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).

On appeal from the state post-conviction proceedings, the Arkansas Supreme Court accurately set forth the standard of review for claims of ineffective assistance of

counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and, with respect to the claim, stated:

> [i]n reviewing an assertion of ineffective assistance of counsel concerning the failure to call a certain witness, [the] court's objective is to determine whether the failure resulted in actual prejudice that denied the petitioner a fair trial.  The decision whether to call or not to call a particular witness is largely a matter of professional judgment.  The fact that there was a witness or witnesses who could have offered beneficial testimony is not, in itself, proof of counsel's ineffectiveness.  Accordingly, in order to demonstrate prejudice, Thomas must establish that there was a reasonable probability that, had counsel presented the witness, the outcome of the trial would have been different.

 <u>Thomas v. State</u>, 431 S.W.3d 923, 929-30 (Ark. 2014)(citations omitted).   The Arkansas court found that the record of Thomas's Rule 37.5 hearing demonstrates that his counsel made a strategic decision not to call Mathis because he did not want to draw attention to the evidence.   The Arkansas court also found that Thomas failed to demonstrate that he was prejudiced by his counsel's decision not to call Mathis to testify.

Thomas argues that Thomas's counsel's requests for Mathis's testimony in a pre-trial conference, including counsel's asserted reasons for Mathis's testimony, and counsel's motion seeking to have Mathis's prior testimony introduced during trial, are more contemporaneous proof of trial strategy and "[b]y ignoring [such evidence], the Arkansas Supreme Court unreasonably determined the facts."  (Doc. 29, p. 52).

However, this Court does not find the Arkansas Supreme Court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   While the facts pointed to by Thomas are additional

evidence of trial strategy, trial counsel specifically testified to their trial strategy in the Rule 37.5 hearing.

Finally, even if the Court were to find the Constitutional error in this regard, relief would not be warranted.   *See* <u>Fry v. Pliler</u>, 551 U.S. 112, 121-122 (2007) (In § 2254 proceedings, a court must assess the prejudicial impact of any constitutional error). Under <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), "the standard for determining whether habeas relief must be granted is whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht</u>, 507 U.S. at 623 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).   According to the Eighth Circuit in <u>Christenson v. Ault</u>, "[a] 'substantial and injurious effect' occurs when a court finds itself in 'grave doubt' about the effect of the error on the jury's verdict."   598 F.3d 990, 994 (2010).   Further, "'grave doubt' exists when the issue of harmlessness is 'so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error.'" <u>Id</u>. (citing <u>Chang v. Minnesota</u>, 521 F.3d 828, 832 (8th Cir. 2008)).   A review of the testimony leads the Court to determine that the failure to include the potential testimony of Lt. Alex Mathis did not negatively affect the jury's verdict.

The Court finds that Issue 1-6 of Thomas's petition should be dismissed.

### 2.    Point 2-1-1:   The Trial Court Violated Mr. Thomas's Fair Cross-Section Rights by Transferring Mr. Thomas's Trial to a County With a Substantially Smaller Population of Persons of Mr. Thomas's Race.[3]

In Point 2-1-1, Thomas contends that the trial court erred when it transferred Mr. Thomas's trial to a county with a substantially smaller population of persons of Mr. Thomas's race.   At trial, Thomas's counsel moved for a change in venue.   The trial court granted Thomas's motion, transferring the case from Sevier County to Pike County. Although trial counsel noted the make-up of the counties during the change of venue arguments, trial counsel failed to raise any of the constitutional arguments currently being raised on objection to the trial court.   The Arkansas Supreme Court, therefore, found that Thomas failed to make a sufficient record that would preserve such an argument on appeal that the trial court erred in transferring the case to Pike County; and, further found that review on appeal was precluded under the contemporaneous objection rule. Thomas v. State, 257 S.W.3d 92, 96-97 (Ark. 2007).   *See also* Wicks v. State, 606 S.W.2d 366 (Ark. 1980).

Accordingly, the Court finds that Point 2-1-1 is procedurally defaulted.   Any argument Thomas may have to excuse the procedural default of Point 2-1-1 will be discussed below.

---

[3] Among other places, Point 2-1-1 is discussed in the following pleadings:   Document 9, p. 59; and, Document 24, p. 34.

### 3.   Point 2-1-2: The Trial Court Erred by Refusing to Supplement the Jury Pool.[4]

In Point 2-1-2, Thomas asserts that the trial court erred by refusing to supplement the jury pool in violation of his Sixth and Fourteenth Amendment Constitutional rights. Specifically Thomas states that the trial judge used a "narrow jury pool drawn from voter registration rolls . . . [and] refused to use a statutorily authorized expanded jury pool that included other citizens drawn from the list of licensed drivers and persons issued a state identification card."   As a result, Thomas argues, "African Americans and the poor were woefully underrepresented in Mr. Thomas's jury venire."

The Respondent argues that this claim was adjudicated on the merits by the Arkansas Supreme Court with the court finding that Thomas failed to make the prima facie showing required by Duren v. Missouri, 439 U.S. 357 (1979) and rejecting his claim that the trial court erred by refusing to supplement the jury pool.   See Thomas, 257 S.W.3d at 97-99.   Further, the Respondent argues that Thomas has not demonstrated the Arkansas Supreme Court's decision to be contrary to, or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence presented in the trial court.

As set forth by the Arkansas Supreme Court, Arkansas Code Annotated § 16-32-301 allowed for jury pool expansion:

(a) The pool of names from which prospective jurors are chosen may be expanded from the list of registered voters to include the list of licensed drivers and persons issued an identification card under § 27-16-805.

---

[4] Among other places, Point 2-1-2 is discussed in the following pleadings:   Document 9, p. 62; Document 24, p. 39; and, Document 29, p. 54.

Further, Arkansas Code § 16-32-303 allowed the administrative circuit judge for each county to determine whether to use the list of registered voters or the enhanced list:

(a) The administrative circuit judge for each county shall determine that either the list of registered voters or the enhanced list, but not both, shall be utilized in the selection of all prospective jurors for all circuit court divisions within the county, based upon a consideration of whether the use of registered voters creates a sufficient pool for the selection of jurors to offer an adequate cross section of the community.

The Arkansas Supreme Court noted that pursuant to a memo dated September 14, 2004 Circuit Judges Charles Yeargan and Ted Capeheart "stated that they did not feel it was in the best interest of the Ninth West Judicial District to change to motor vehicle registration." Thomas, 257 S.W.3d at 98.

The Arkansas Supreme Court correctly set forth the standard with respect to a claim that an individual's right to a jury chosen from a fair cross section of his community has been violated:

[i]n order to establish a prima facie case of deliberate or systemic exclusion, a defendant must prove that: (1) the group alleged to be excluded is a 'distinctive' group in the community; (2) the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systemic exclusion of the group in the jury-selection process.

Thomas v. State, 257 S.W.3d 92, 98 (Ark. 2007)(citing Lee v. State, 942 S.W.2d 231 (Ark. 1997); Duren v. Missouri, 439 U.S. 357 (1979)).   The state court went on to find that Thomas had failed to prove "systemic exclusion of black people from the jury-selection process."

Although Thomas argues that the state court held that one can never establish a fair cross-section violation when the jury venire is randomly selected, the Arkansas

14

Supreme Court *instead* held "when the jury venire is drawn by random selection, the mere showing that it is not representative of the racial composition of the population will not make a prima facie showing of racial discrimination."   Thomas, 257 S.W.3d at 77-78. Further, as set forth in Berghuis v. Smith, 559 U.S. 314, 329 (2010) "neither Duren nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools."   The Court finds that the Arkansas Supreme Court's decision on this issue is neither contrary to nor an unreasonable application of established federal law.

The Court dismisses Point 2-1-2 of Thomas's petition.

### 4.   Claim 12: The Trial Court Unfairly Denied Mr. Thomas an Adequate Opportunity To Prepare for Trial.[5]

In Claim 12, Thomas argues that the trial court's denial of a continuance violated his federal constitutional rights to counsel and the effective assistance thereof, to due process, and to a fair and reliable determination of death eligibility and sentence selection, as guaranteed by the Sixth, Eighth and Fourteenth Amendment.   Thomas further argues that the trial court unconstitutionally forced Thomas to trial despite his attorneys' repeated objections that they had not conducted an adequate investigation or completed preparation for his case.

The Respondent asserts that Thomas has not demonstrated the Arkansas Supreme Court's decision to be contrary to, or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence presented in the trial court.   The Respondent points to the reasons the

---

[5] Among other places, Claim 12 is discussed in the following pleadings:   Document 9, p. 234; Document 24, p. 131; and, Document 29, p. 56.

Arkansas Supreme Court cited in finding that the denial of a continuance was not an abuse of discretion.   Thomas, 257 S.W.3d at 101(citing Dirickson v. State, 953 S.W. 2d 55 (Ark. 1997)).

As set forth by the Arkansas Supreme Court, under Arkansas law, "[a] trial court shall grant a continuance only upon a showing of good cause and only for so long as is necessary, taking into account not only the request or consent of the prosecuting attorney or defense counsel, but also the public interest in prompt disposition of the case." Thomas, 257 S.W.3d 92, 101 (Ark. 2007)(citing Ark. R. Crim. P. 27.3 (2006)).

According to Ungar v. Sarafite, 376 U.S. 575 (1964), "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary to violate due process;" instead, "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Id. at 589.   Further, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."   Id. at 590.   The Supreme Court later emphasized in Morris v. Slappy, 461 U.S. 1 (1983), "[t]rial judges necessarily require a great deal of latitude in scheduling trials.   461 U.S. at 11. "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise prepare for trial violates a defendant's Sixth Amendment right to counsel."   Id.

Noting the generality of the constitutional rule with respect to a continuance request, the Eighth Circuit in Middleton v. Roper, 498 F.3d 812, (8th Cir. 2007) noted "[i]n applying the deferential standard of AEDPA, '[t]he more general the rule, the more leeway

16

courts have in reaching outcomes in case-by-case determinations.'" Id. at 817 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

The Arkansas Supreme Court noted that the trial court denied Thomas's requests for a continuance because the trial had been set prior to one of counsel's other trial settings; because the trial court believed an unavailable witness would be at trial; and because the court did not believe requested DNA evidence would be exculpatory. Considering the reasons for the trial court's denial, and Thomas's failure to show that he was prejudiced in any way by the denial of the continuances, the Arkansas Supreme Court found no abuse of discretion by the trial court.

Although Thomas argues that the Arkansas Supreme Court's finding is contrary to or an unreasonable application to established federal law, this Court disagrees. The Arkansas Supreme Court reviewed the totality of the circumstances surrounding the requests for continuances and found justifiable reasons for the denial.

The Court finds that the holding was neither contrary to nor an unreasonable application of established federal law and therefore dismisses Claim 12 of Thomas's petition.[6]

### 5.     Claim 16:   Improper Instructions, and the Trial Judge's Refusal to Give Adequate Instructions, Violated Mr. Thomas's Constitutional Rights at the Penalty Stage.[7]

Claim 16 includes two parts concerning the jury instructions given during the penalty stage of Thomas's trial.   Thomas claims that the trial judge gave prejudicial jury

---

[6] For the reasons explained below, trial counsel's lack of proper investigation and preparation for trial – which precipitated the need for a continuance – is a separate issue.

[7] Among other places, Claim 16 is discussed in the following pleadings:   Document 9, p. 256; and, Document 24, p. 143.

instructions, and refused to give necessary jury instructions, in violation of Thomas's federal constitutional rights to due process, equal protection, trial by jury, freedom from cruel and unusual punishment, and a fair and reliable determination of guilt, death-eligibility, and sentence, guaranteed by the Sixth, Eighth, and Fourteenth Amendments.

### a.   Issue 16-1: Trial Court Erred by Giving Jury Instruction Which Imposed a Non-Statutory Burden on Mr. Thomas to Prove Mitigating Circumstances "Probably" Existed.

Thomas argues that the "trial court erroneously refused to eliminate the word 'probably' from the mitigating circumstances instruction in violation of Mr. Thomas's Fourteenth Amendment right to due process and Eighth Amendment right to freedom from cruel and unusual punishment" by limiting the jury's consideration of mitigating evidence to evidence that supported a mitigating circumstance that "probably" existed.

According to the findings of the Supreme Court of Arkansas,

> [a]t a pre-trial hearing, [Thomas] requested that the trial court substitute a non-AMCI Form 2 because the AMCI 2d Form 2 places the burden on [Thomas] to prove that mitigating circumstances 'probably' exist. [Thomas] argues (1) that the language 'probably exist' in the AMCI Instruction is not found in the statutes, but is a product of this Court's rule-making process, thus violating the separation of powers doctrine; (2) that the language violates the Eighth and Fourteenth Amendment's prohibition against cruel and unusual punishment because the burden of proof is imposed by the Court, rather than the legislature; and (3) that the language violates the Eighth and Fourteenth Amendment's ban on cruel and unusual punishment because it prohibits jurors from considering and giving effect to mitigating evidence that 'possibly' or 'maybe' exists.

Thomas v. State, 257 S.W.3d 92, 103 (Ark. 2007).

The Respondent states that the Supreme Court of Arkansas affirmed the trial court's denial of Thomas's requested instructions, rejecting Thomas's claims that the language "probably exist" in the mitigating circumstances verdict forms and that the trial

court's failure to define "mitigating circumstances" prevented the jurors from considering all mitigating evidence in violation of his constitutional rights.   See Thomas, 257 S.W.3d at 99-100, 102-103.   The Respondent argues that Thomas has not demonstrated that the Supreme Court of Arkansas's adjudication of his mitigation-instruction claims resulted in a decision that was contrary to, or involved an unreasonable application of the relevant federal law principles, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the trial court.

The Supreme Court of Arkansas noted that "criminal jury instructions do not trump the plain language of . . . criminal statutes."   257 S.W.3d at 103 (citing Jones v. State, 182 S.W.3d 485 (Ark. 2004)).   The court further noted, however, that previous holdings "have created a presumption that the model instruction is a correct statement of the law . . . [and] any party who wishes to challenge the accuracy of a model instruction . . . must rebut the presumption of correctness."   Id.   The court concluded that the word "probably" in the model jury instruction did not impose a non-statutory burden on Thomas, quoting a prior opinion of the court:

> We do not believe that the addition of the word "probably" in the model instruction that the jury received regarding mitigating factors in any way affected which party had the burden of proof.   Nor do we believe that this language suggested to the jury that Thessing had the burden of proof. Nothing in the model instruction given to the jury states that Thessing was required to prove that the mitigating factors probably existed.   It simply states that "[a] mitigating circumstance is shown if you believe from the evidence that it probably existed."   We agree with the State that the instruction is worded differently from the statute and that this may be an issue that this court's committee on model jury instructions should address. Nevertheless, we also agree with the State that any discrepancy in wording actually benefitted Thessing as proof of a mitigator under the standard of "probably existed" is less severe than actual existence.

Thessing v. State, 230 S.W.3d 526, 543 (Ark. 2006).

19

According to <u>Boyde v. California</u>, 494 U.S. 370 (1990), the Supreme Court found the proper inquiry when reviewing an ambiguous jury instruction to be "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  494 U.S. at 380.  This Court does not find that there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.  This Court further finds the decision of the Arkansas Supreme Court to be neither contrary to, nor an unreasonable application of established federal law.

### b.  Issue 16-2: The Trial Court Erroneously Refused to Provide the Jury with a Definition of "Mitigating Circumstances."

Thomas also argues that the trial court violated his right to due process, to present a defense, to freedom from cruel and unusual punishment, and to a fair and reliable determination of sentence selection, guaranteed by the Eighth and Fourteenth Amendments, when the court arbitrarily refused to provide the jury with a definition of the term "mitigating circumstances."

The Arkansas Supreme Court addressed this issue.  According to the Arkansas Supreme Court decision, Thomas asked the court "to declare Ark. Code Ann. §§ 5-4-603-5-4-605 (Repl. 1997) constitutionally defective due to [Thomas's] assertion that it fails to guide the jury by failing to define 'mitigation' and does not clearly and objectively establish standards with regard to the weight and effect to be given mitigation evidence."  <u>Thomas</u>, 257 S.W.3d at 99.  The Arkansas Supreme Court stated "[w]e have repeatedly upheld the Arkansas capital-sentencing scheme.  The capital-murder sentencing statutes are

not unconstitutionally vague simply because there is no definition of 'mitigating circumstance.'" Thomas v. State, 257 S.W.3d 92, 99 (Ark. 2007)(citing Henderson v. State, 652 S.W.2d 26, *cert. denied*, 464 U.S. 1012 (1983)).   As set forth above, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility that the jury was inhibited from considering relevant mitigating evidence. Boyde v. California, 494 U.S. 370, 380 (1990).   See also Ayers v. Belmontes, 549 U.S. 7, 14 (2006).   Here, out of thirty-two (32) mitigating circumstances presented to the jury, at least one member of the jury found that twenty-five (25) mitigating circumstances probably existed.   Thomas has not proven that there was a reasonable likelihood that the absence of a definition of "mitigating circumstance" prevented the consideration of constitutionally relevant evidence.

In this respect, the Court again finds the decision of the Arkansas Supreme Court to be neither contrary to, nor an unreasonable application of established federal law.   To the extent that Thomas's arguments contained in Claim 16 were addressed by the Arkansas Supreme Court, the claim is dismissed.   Any other arguments contained in Claim 16 are either unexhausted or procedurally defaulted and will be discussed below.

### 6.   Claim 17:   The State Used Improper and Unconstitutional Victim-Impact Testimony.[8]

In Claim 17, Thomas argues that his death sentences should be vacated because they were secured through the use of improper and unconstitutional victim impact testimony, in violation of his rights to fundamental fairness and to freedom from arbitrary or capricious infliction of the death penalty, guaranteed by the Due Process Clause of the

---

[8] Among other places, Claim 17 is discussed in the following pleadings:   Document 9, p. 260; and, Document 24, p. 149.

Fourteenth Amendment and by the Cruel and Unusual Punishment Clause of the Eighth Amendment to the federal Constitution.   The Respondent asserts that the Arkansas Supreme Court addressed Thomas's claim – at least to the extent he argues a violation of his Eighth Amendment rights; and, that the state court's rejection of the claim is neither contrary to, nor an unreasonable application of, clearly established law, pointing specifically to Payne v. Tennessee, 501 U.S. 808 (1991).   The Respondent further asserts that the due process portion of Thomas's claim regarding the specific victim-impact testimony offered during trial does not merit relief because it is procedurally defaulted.

On appeal to the Arkansas Supreme Court, Thomas argued that the trial court erred by failing to grant his motions to prohibit victim-impact evidence; that victim-impact evidence is only allowed by Arkansas law when relevant to the aggravators or mitigators advanced at trial; and that instead of helping to prove the aggravators or disprove any of the mitigators, the victim-impact evidence introduced "only encouraged the jury to respond emotionally and to arbitrarily base its decision on irrelevant matters."   Thomas v. State, 257 S.W.3d 92, 100 (Ark. 2007).

Under Arkansas Code Annotated § 5-4-603(a), for the state to sentence a defendant to death it must demonstrate (1) that aggravating circumstances exist beyond a reasonable doubt; (2) that aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and (3) that the aggravating circumstances justify a sentence of death beyond a reasonable doubt.   Victim-impact evidence is allowable under Ark. Code Ann. § 5-4-602(4) at the sentencing phase of a capital case as "relevant to a jury's determination of the appropriateness of the death

22

penalty." Fudge v. State, 20 S.W.3d 315, 321 (Ark. 2000).   The court cited Arkansas Supreme Court precedent rejecting the argument that "victim-impact evidence acts as an aggravating circumstance or that it violates the statutory weighing process set out in capital murder cases." Thomas, 257 S.W.3d at 100.   (citing Anderson v. State, 242 S.W.3d 229 (2006); Johnson v. State, 157 S.W.3d 151 (2004); Noel v. State, 960 S.W.2d 439 (1998)).   Instead, the court found victim-impact evidence relevant as it "informs the jury of the toll the murder has taken on the victim's family."   Thomas, 257 S.W.3d at 100. The Arkansas court further cited United States Supreme Court precedent which held that "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne v. Tennessee, 501 U.S. 808, 827 (1991). Accordingly, the Arkansas court's decision was neither contrary to, nor an unreasonable application of, clearly established law.   To this extent, Thomas's Claim 17 is dismissed.

To the extent, however, that Thomas argues that the specific victim-impact evidence admitted during the sentencing was a violation of his *due process* rights, the Court finds the claim unexhausted.   Thomas appealed, to the state's highest court, the trial court's denial of his pre-trial motions concerning victim-impact evidence and the relevance of the evidence admitted at trial.   The availability of any relief on the unexhausted portion of this claim will be discussed below.

**B.  Claims for Relief Not Presented to the State Courts**

As set forth above, before seeking federal habeas review, a state prisoner must first "exhaus[t] the remedies available in the courts of the State."   28 U.S.C. § 2254(b)(1)(A).   To meet the exhaustion requirement, a prisoner must present his claims

23

through "one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).   Accordingly, "to fully exhaust claims raised in a state post-conviction petition, a prisoner must appeal the denial of that petition to the state's highest court."   Williams v. Hobbs, 2014 WL 7152687 (December 15, 2014)(citing Armstrong v. Iowa, 418 F.3d 924, 925-26 (8th Cir. 2005)).   If, however, "the state courts decline to review a claim because the prisoner has failed to comply with 'independent and adequate' state procedural rules for presenting it, the claim is procedurally defaulted."   Id.   (citing Coleman, 501 U.S. at 729-30, 750).

The Respondent claims that each and every claim not effectively presented to the state courts is barred by the doctrine of procedural default.   Thomas, however, argues that, largely, the claims which were not ruled on by the Arkansas Supreme Court are unexhausted and, that this case should be stayed and held in abeyance pending further litigation of those claims in the state courts.   Alternatively, Thomas argues that the procedural default of certain claims should be excused.

### 1.   Unexhausted Claims

According to Eighth Circuit precedent,

A habeas petitioner is required to pursue all available avenues of relief in the state courts before the federal courts will consider a claim.   If a petitioner fails to exhaust state remedies and the court to which he should have presented his claim would now find it procedurally barred, there is a procedural default.   If the federal court is unsure whether a claim would be rejected by the state courts, the habeas proceeding should be dismissed without prejudice or stayed while the claim is fairly presented to them.   If, however, it is clear that the state courts would find the claim to be procedurally barred and that a return to the state courts would be futile, the federal court may consider an unexhausted claim.   A petitioner could then try to overcome any procedural default by showing cause or actual prejudice.

Sloan v. Delo, 54 F.3d 1371, 1381-82 (8th Cir. 1995)(citations omitted).

The courts have recognized that dismissing unexhausted claims may result in the expiration of the statute of limitations for federal habeas actions provided in 28 U.S.C. § 2244(d)(1).   The Supreme Court has therefore instructed that a district court may stay a federal habeas petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims.   Rhines v. Weber, 544 U.S. 269, 275 (2005).   However,

> stay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court.   Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

Rhines, 544 U.S. at 277.   Finally, "if a petitioner engages in abusive litigation tactics or intentional delay, the district court should not grant him a stay at all."   Id. at 278.

As previously stated, Thomas argues that the majority of his claims are unexhausted, and that, because certain state court procedures are available, this matter should be stayed and held in abeyance pending exhaustion in state court.   Specifically, Thomas asserts that relief remains available to him in the state courts by means of a motion to recall the mandate; and, with respect to Claim 15, a petition for writ of coram nobis.   As explained below, the scope of each of these remedies is limited.

### a.   Motion to Recall the Mandate

Thomas argues that a motion to recall the mandate is an available remedy in the Arkansas courts because of the state's failure to provide Thomas with effective post-conviction counsel.

According to established caselaw, the Arkansas Supreme Court will "recall a mandate and reopen a case only in extraordinary circumstances." Ward v. State, 455 S.W.3d 830, 832 (Ark. 2015). To establish the extraordinary circumstances that would warrant the recall of a mandate the following factors must be present: "(1) the presence of a defect in the appellate process, (2) a dismissal of proceedings in federal courts because of unexhausted state-court claims, and (3) the appeal is a death case that requires heightened scrutiny." Id. (citing Roberts v. State, 426 S.W.3d 372 (Ark. 2013)).

Thomas argues that the ineffective assistance of his post-conviction counsel amounted to a defect in the appellate process; and, that, therefore, a motion to recall the mandate as an available remedy is not clearly futile. While it is true that the Arkansas Supreme Court has recalled a mandate and reopened a case due to extreme ineffective assistance of counsel, the Arkansas Supreme Court has recently held "[w]e do not entertain a claim for recalling the mandate based solely on allegations of ineffective assistance of postconviction counsel." Ward v. State, 455 S.W.3d 830, 835 (Ark. 2015). The allegations of ineffective assistance here, while potentially significant and prejudicial, are typical – lack of preparation, mismanagement, and inattention to detail and deadlines. The claims are different from those upon which the Arkansas Supreme Court has granted relief through recall.[9] In sum, the Arkansas standard is clear -- "recalling the mandate is an extremely narrow remedy reserved for unique situations; to enlarge it to allow typical claims of ineffective assistance of counsel would alter the nature of the relief entirely."

---

[9] In Lee v. State, 238 S.W.3d 52 (Ark. 2006), the Arkansas Supreme Court recalled the mandate where post-conviction counsel was intoxicated and impaired during the course of the proceedings. Here, as in Ward, the allegations are that Thomas's counsel "was merely ineffective, and not impaired or intoxicated . . . [accordingly] he has not presented legal grounds to recall the mandate." Ward v. State, 455 S.W.3d 830, 835-36 (Ark. 2015).

Ward v. State, 455 S.W.3d 830, 835 (Ark. 2015).   The Court, therefore, finds a stay for

the purpose of the pursuit of a recall of the mandate to be clearly futile.

The Court also notes that, although under a slightly different procedural posture,

the Eighth Circuit has found that the procedure "appears to remain extraordinary rather

than routine" and "is not a proper vehicle for exhausting state remedies in Arkansas."

Wooten v. Norris, 578 F.3d 767, 784, 786 (8th Cir. 2009).   *See also* Dansby v. Hobbs,

766 F.3d 809, 829 (8th Cir. 2014)(reaffirming holding of Wooten that "[a] motion to recall

the mandate in Arkansas is not part of Arkansas's standard review process.").

### b.   Writ of Error *Coram Nobis*, Claim 15

Thomas also claims that a writ of *coram nobis* is an available remedy in state court

with respect to Claim 15 of his petition which asserts that he was incompetent to stand

trial.   Under Arkansas law, "[a] writ of error coram nobis is an extraordinarily rare remedy,

more known for its denial than its approval."   Newman v. State, 354 S.W.3d 61, 65 (Ark.

2009).   The writ has been allowed to address certain errors:   "insanity at the time of trial,

a coerced guilty plea, material evidence withheld by the prosecutor, or a third-party

confession to the crime during the time between conviction and appeal."   Id.   Further,

the writ will only be granted "when it appears the proposed attack on the judgment is

meritorious.   In making such a determination, we look to the reasonableness of the

allegations of the petition and to the existence of the probability of the truth thereof."   Id.

"The burden is on the petitioner to show that the writ is warranted, and a bare assertion

with no factual support does not justify reinvesting jurisdiction in the circuit court to

consider a petition for writ of error coram nobis."   Pitt v. State, 2014 Ark. 132 (March 20,

2014)(not reported in S.W.3d).

Further, "[a]lthough there is no specific time limit for seeking a writ of error coram nobis, due diligence is required in making an application for relief.   In the absence of a valid excuse for delay, the petition will be denied."   Wright v. State, 2014 Ark. 25 (Jan. 23, 2014)(not reported in S.W.3d)(citations omitted).   The Arkansas Supreme Court has held that "[d]ue diligence requires that (1) the defendant be unaware of the fact at the time of the trial; (2) the defendant could not have, in the exercise of due diligence, presented the fact at trial; and (3) the defendant, after discovering the fact, did not delay bringing the petition."   Anderson v. State, 423 S.W.3d 20, 26 (Ark. 2012).   Finally, the Arkansas courts "have repeatedly held that allegations made in support of error coram nobis that are premised on ineffective-assistance-of-counsel claims are not cognizable in error coram nobis proceedings."   Nelson v. State, 431 S.W.3d 852, 855 (Ark. 2014).

Here, as set forth above, Thomas claims that he was incompetent to stand trial. Specifically, in claim 15 of his petition, Thomas states that he "was suffering from a devastating complex of mental disorders and disabilities that undermined his ability to consult with his lawyers with a reasonable degree of rational understanding and prevented him from gaining a rational and factual understanding of the proceedings against him."   (Amended Petition, Doc. 9, Claim 15, p. 244)   As set forth by the petition, soon after his arrest, Thomas was ordered to undergo a mental health evaluation to determine whether he was competent to proceed and whether he appreciated the criminality of his conduct at the time of the offense.   He was examined by Dr. Michael McAllister and was found competent to stand trial.   Thomas asserts that Dr. McAllister's examination "was woefully inadequate in multiple respects."   Thomas specifically argues: that Dr. McAllister's examination was unreasonably short, and did not include the

28

assistance of a social worker or medical doctor; that Dr. McAllister did not gather past medical, school, prison and mental health records; that Dr. McAllister's testing was inadequate and deficient; and that Dr. McAllister ignored "clear signs" that Thomas was suffering from a mental disease or defect that affected his ability to understand the proceedings against him.

Incorporated into Thomas's Claim 15 are the arguments contained in Issue 10-1 of the petition that he received ineffective assistance of counsel during the mitigation phase of trial.   The Court has allowed for the expansion of the record with regard to Issue 10-1.   (Order, Doc. 35).   Included in that expansion is the expert report of Dr. Logan, in which he expresses his opinion that Mr. Thomas was not competent to stand trial at the time he was tried in 2005.   (Doc. 28-35, Expert Report of Dr. Logan).   The Court also received evidence with respect to Thomas's competency during the hearing held the week of January 30, 2017.   Such evidence included the reports and testimony of Dr. Lisak and Dr. Gur, as well as the testimony of Thomas's trial counsel concerning his behavior during their representation of him.   Based upon Thomas's petition and this evidence, the Court concludes that Claim 15 is meritless.   The Court simply does not believe the weight of the evidence supports that Thomas was incompetent to stand trial under the standard set forth in Dusky v. United States, 362 U.S. 402 (1960).[10]

In addition, the Court notes that Thomas's lack of diligence in pursuit of this issue via writ of coram nobis in state court also weighs against Thomas's likelihood of success

---

[10] Additionally, as noted in § IV(C)(2)(b) below, during the March 8, 2017 post-hearing arguments, Petitioner's counsel conceded that the proof presented at the evidentiary hearing did not support Issue 1-14, in which Thomas argues that his trial counsel was ineffective in that they failed to argue that he was incompetent to stand trial.   The Court further notes below that there was significant proof presented during the evidentiary hearing that Thomas was cooperative and helpful to his trial counsel and that he understood the proceedings against him.

in state court.   Clearly, Thomas's current counsel were formulating this argument prior to the filing of Thomas's original petition in March of 2014.   For all of these reasons, the Court finds that a stay for the purpose of the pursuit of a writ of error coram nobis would be clearly futile.

### 2.   Procedurally Defaulted Claims

As set forth above, the Respondent claims that each and every claim not effectively presented to the state courts is barred by the doctrine of procedural default.   Thomas, however, argues that certain exceptions apply to the State's alleged procedural bar.

This Court may only consider the merits of the procedurally defaulted claims if Thomas can show (1) cause for the default and actual prejudice, or (2) that the default will result in a fundamental miscarriage of justice.   Sawyer v. Whitley, 505 U.S. 333, 338-39 (1992); Coleman v. Thompson, 501 U.S. 722, 749-50 (1991).   The procedural default analysis is frequently difficult and costly; where it is more efficient, this Court may resolve Thomas's claims on the merits rather than tackling the complexity of a procedural-default determination.   See McKinnon v. Lockhart, 921 F.2d 830, 833 n. 7 (8th Cir. 1990).   See also John C. Jeffries, Jr. & William J. Stuntz, Ineffective Assistance and Procedural Default in Federal Habeas Corpus, 57 U. Chi. L. Rev. 679, 690 (1990).

### a.   Trevino Cause and Prejudice

Thomas asserts that the procedural default of certain claims can be excused under Trevino v. Thaler, 133 S.Ct. 1911 (2013) and Martinez v. Ryan, 132 S.Ct. 1309 (2012). Under Trevino and Martinez, ineffectiveness of counsel in initial collateral proceedings may establish cause to excuse the procedural default of an ineffective assistance of *trial* counsel claim.   Trevino v. Thaler, 133 S.Ct. 1911, 1921 (2013); Martinez v. Ryan, 132

S.Ct. 1309, 1315 (2012); Sasser v. Hobbs, 735 F.3d 833, 853-54 (8th Cir. 2013).   Further, an evidentiary hearing is required where the petitioner's underlying claim is "potentially meritorious."   Sasser, 735 F.3d at 851.   Thomas argues that a Trevino hearing should be held with respect to the entirety of his claims of ineffective assistance of trial *and* appellate counsel, as well as all underlying claims of trial error forfeited by ineffective assistance of counsel.

As set forth above, the Court previously found that Thomas may be able to establish actual prejudice on his post-conviction ineffectiveness claims arising from the alleged failure of trial counsel to present compelling mental health and mitigation evidence.   (Order, Doc. 40).   The Court also found that Thomas's claims arising from the alleged failure of trial counsel in the investigation and presentation of claims of juror misconduct were potentially meritorious and warranted a hearing under Trevino.   The Court, therefore, held an evidentiary hearing on the following claims concerning mental health and mitigation evidence, and juror misconduct:

\*   Point 1-5-1, Failure to Support Theory of Defense with Readily Available Evidence, including the bases for this claim incorporated through Issue 10-1;

\*   Issue 1-13, Ineffective Assistance of Counsel with Respect to Suppression Claim, including the bases for this claim set forth under Claim 14;

\*   Issue 1-14, Failure to Support Claim of Incompetency to Stand Trial with Readily Available Evidence, including the bases for this claim incorporated through Issue 10-1 and Claim 15; and,

\*   Issue 10-1, Ineffective Presentation of the Case in Mitigation, including the bases for this claim presented in each of the Points under Issue 10-1.

* Issue 1-11, Failure to Raise Claims of Juror Misconduct, including all bases for this claim incorporated through Claim 11;

* Point 10-2-2, Trial Counsel Failed to Investigate for, Discover, and Present Claims of Juror Misconduct, including all bases for this claim incorporated through Claim 11; and,

* Issue 13-2, Failure to Raise Claims of Jury Misconduct by trial counsel, including all bases for this claim incorporated through Claim 11.

The Court's findings with respect to these claims are discussed in section IV(C) below.

### i.    Remaining Claims of Ineffective Assistance of Trial Counsel

In order for Martinez and Trevino to apply to the remaining claims of ineffective assistance of trial counsel (Claim 1, except 1-5-1, 1-6, 1-11, 1-13, 1-14; Claim 10, except 10-1, 10-2-2; and Claim 13, except 13-2), Thomas must establish a showing of prejudice as defined by Strickland – "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   Strickland, 466 U.S. 668, 694 (1984).   An evidentiary hearing is required where the petitioner's underlying claim is "potentially meritorious."   Sasser, 735 F.3d at 851.   Having reviewed the claims, the Court finds that none of these claims meet the "potentially meritorious" standard.

### ii.    Claims of Ineffective Assistance of Appellate Counsel

Thomas also argues that he should be granted a Trevino hearing on his claim of ineffective assistance of *appellate* counsel (Claim 20), as well as all of his underlying claims of trial error not presented in state court due to ineffective assistance of counsel

at the trial and/or appellate level – i.e., those parts of Claims 2, 3, 4, 5, 6, 7, 8, 9, 11, 14, 15, 17, 18, and 19 that have not been adjudicated on the merits in state court.

The issue presented with respect to the claim of ineffective assistance of appellate counsel has been directly addressed by the Eighth Circuit Court of Appeals.   The Eighth Circuit, in Dansby v. Hobbs, refused "to extend Martinez to claims alleging ineffective assistance of counsel on direct appeal."   766 F.3d 809, 833 (8th Cir. 2014).   According to the Eighth Circuit, Martinez applies to a claim of ineffective assistance of counsel at trial.   The right to trial counsel is based on rights guaranteed by the Sixth Amendment to the Constitution; the right to appellate counsel, instead, has its origin in the Due Process Clause.   Dansby, 766 F.3d at 833 (citing Martinez, 528 U.S. 152, 159-60 (2000) and Evitts v. Lucey, 469 U.S. 387, 396-97 (1985)).   Further, the Eighth Circuit in Dansby pointed out that the Supreme Court was clear in Martinez that the rule of Coleman—that ineffective assistance of counsel during state post-conviction proceedings cannot serve as cause to excuse procedural default—"governs in all but the limited circumstances recognized here," and those circumstances involved a claim that trial counsel was constitutionally ineffective.   Martinez, 132 S.Ct. at 1320; Coleman v. Thompson, 501 U.S. 722, 752-55 (1991).   Similarly, Martinez is not applicable to Thomas's claim that he received ineffective assistance of counsel during the initial-review collateral proceedings (Claim 21) and a hearing under Trevino is not warranted in that respect.

Thomas's claim concerning ineffective assistance of counsel during the initial-review collateral proceedings (Claim 21) further fails on the merits.   28 U.S.C. § 2254(I) provides that "the ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief."   Although

33

ineffective assistance of counsel during the initial-review collateral proceedings can, under Martinez, provide cause for the procedural default of claims of ineffective assistance of trial counsel, "'[c]ause,' . . . is not synonymous with a 'ground for relief.'   A finding of cause and prejudice does not entitle the prisoner to habeas relief.   It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted."   Martinez v. Ryan, 132 S.Ct. at 1320.

Finally, except to the extent that any facts set forth in the stand alone claims form the basis for Thomas's claims of ineffective assistance of trial counsel, the stand alone claims in no way merit a Trevino hearing.

### b.   Cause and Prejudice Outside the Trevino Analysis / Miscarriage of Justice

Thomas claims that he can establish cause and prejudice outside the Trevino analysis in order to overcome procedural default with respect to certain claims. Specifically, Thomas argues that "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has *cause* for his failure to raise the claim in accordance with applicable state procedures."   Reed v. Ross, 468 U.S. 1, 16 (1984)(emphasis added).   Thomas also argues that cause can be established if the "*factual* . . . basis for a claim was not reasonably available to counsel."   Murray v. Carrier, 477 U.S. 478, 488 (1986)(emphasis added).

34

### i. Claim 18: Mr. Thomas's Sentences Should be Vacated Because He Suffered From Severe Mental Disorders and Disabilities at the Time of the Offense.[11]

In Claim 18, Thomas argues that his sentences should be vacated because he suffered from severe mental disorder and disabilities at the time of the offense. Specifically, he argues that the death sentences violate his federal constitutional rights to equal protection and freedom from cruel and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments, because, at the time of the offenses, he suffered from a combination of severe mental disorders and disabilities that significantly impaired his capacity to appreciate the nature, consequences, or wrongfulness of his conduct; to exercise rational judgment in relation to the conduct; and/or to conform to the requirements of the law.   Thomas argues that any procedural default of this claim should be excused because the claim is novel and because the underlying facts show that Thomas's death sentence is substantively illegal.

The Court finds the alleged cause and prejudice to excuse procedural default lacking.   More importantly, the Court finds Claim 18 without merit.   *See* <u>McKinnon v. Lockhart</u>, 921 F.2d 830, 833 n. 7 (8th Cir. 1990).   To find the death penalty constitutionally inapplicable to the mentally ill would be an extension of <u>Atkins</u>, which would constitute a new rule of constitutional law.   <u>Atkins v. Virginia</u>, 536 U.S. 304, 320 (2002)(finding individuals who are not mentally retarded "are unprotected by the [<u>Atkins</u>] exemption and will continue to face the threat of execution").   <u>See also</u> <u>State v. Dunlap</u>, 313 P.3d 1, 35-

---

[11] Among other places, Claim 18 is discussed in the following pleadings:   Document 9, p. 262; Document 24, p. 154; and, Document 29, p. 46.

36 (Idaho 2013)(discussing courts which have refused to extend <u>Atkins</u> and hold that the Eighth Amendment categorically prohibits execution of the mentally ill).

> **ii.    Claim 19: The Death Penalty Violates the Eighth Amendment.**[12]

In Claim 19, Thomas argues that the death penalty violates the Eighth Amendment's cruel and unusual punishment clause.   Thomas argues that the cruel and unusual punishment clause "draws its meaning from the evolving standards of decency that mark the progression of a maturing society."   Thomas asserts that the procedural default of this claim should be excused because it is legally novel and relies on facts that were not in existence at the time of Thomas's trial.   The Court finds both no cause to excuse the procedural default and no merit to the claim.

The United States Supreme Court recently reiterated the constitutionality of the death penalty in <u>Glossip v. Gross</u>, 135 S.Ct. 2726, 2732-3 (2015)("[I]t is settled that capital punishment is constitutional," thus "'[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'"   (<u>quoting</u> <u>Baze v. Rees</u>, 553 U.S. 35, 47 (2008)).   Thomas has not presented any new and retroactive United States Supreme Court law to contradict <u>Glossip</u> and support his argument.   Accordingly, Claim 19 should be dismissed.

---

[12] Among other places, Claim 19 is discussed in the following pleadings:   Document 9, p. 264; Document 24, p. 156; and, Document 29, p. 46.

### iii.    Claim 22: Cumulative Error Violated Mr. Thomas's Constitutional Rights.[13]

In Claim 22, Thomas argues that his convictions and sentences were unlawfully obtained in violation of his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights as a result of the multiple constitutional errors committed by the prosecutor, Thomas's counsel, the trial court, and the jurors.   Thomas argues that the errors together render Thomas's trial fundamentally unfair and render the verdicts and judgments unreliable and in violation of his Fourteenth Amendment right to due process.   This claim is both procedurally defaulted and lacks merit.

According to the Eighth Circuit:

> [w]e repeatedly have recognized "a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which by itself meet the prejudice test." Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir.2002) (citation omitted); see, e.g., United States v. Robinson, 301 F.3d 923, 925 n. 3 (8th Cir.2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of cumulative error doctrine); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir.1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation." (citation omitted)); Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir.1990) (holding "cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own" (citation omitted)).

Middleton v. Roper, 455 F.3d 838, 851 (8th Cir. 2006).   Based on this clear precedent, the Court finds that Claim 22 should be dismissed.

### C.  Claims for Relief Addressed During the Evidentiary Hearing

As set forth above, this Court held an evidentiary hearing the week of January 30, 2017.   The parties were instructed that the Court would consider the procedurally

---

[13] Among other places, Claim 22 is discussed in the following pleadings:   Document 9, p. 278; and, Document 24, p. 159.

defaulted claims set forth in Appendix A.   Under <u>Trevino</u> and <u>Martinez</u>, Thomas's post-conviction counsel's alleged ineffectiveness, if proved, could excuse any procedural default Thomas may have committed by not presenting these ineffective assistance of trial counsel claims in the first instance.   <u>Sasser v. Hobbs</u>, 735 F.3d 833, 853 (8th Cir. 2013).   Specifically, <u>Sasser</u> instructs that the proper questions are:   "(1) did state post-conviction counsel fail to raise these . . . ineffectiveness claims, and (2) do these claims merit relief?"   <u>Id</u>. at 853.

### 1.  Did Post-Conviction Counsel Fail to Raise the Claims?

The Court has found the claims set forth in Appendix A procedurally defaulted. The Court initially notes, however, that the Respondent argues that at least certain claims set forth in Appendix A do not fall under the purview of <u>Martinez</u> because they were raised in the initial state Rule 37 proceeding, despite being clearly defaulted on appeal of that proceeding.   The Respondent, citing <u>Sasser v. Hobbs</u>, asserts that the <u>Martinez</u> exception does not apply to evidentiary or appellate defaults. <u>Sasser v. Hobbs</u>, 735 F.3d 833, 853-54 (8th Cir. 2013).

The Court acknowledges that as explained by the Eighth Circuit in <u>Arnold v. Dormire</u>, the <u>Martinez</u> exception does not "'concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings. . . .'" <u>Arnold v. Dormire</u>, 675 F.3d 1082, 1087 (8th Cir. 2012)(quoting <u>Martinez v. Ryan</u>, 566 U.S. 1, 16 (2012)).   The Court does not, however, find that this limitation applies to the circumstances here.

Thomas's Rule 37 Amended Petition for Post-Conviction Relief Pursuant to Rule

37.5 A.R.Cr.P. included the following claims concerning ineffective assistance of trial

counsel:

> c.   Trial counsel, Llewellyn J. Marczuk, was ineffective at trial due to
> personal issues that impaired his judgment.
>
> d.   Trial counsel was ineffective for failing to properly investigate the
> underlying allegations.
>
> e.   Trial counsel was ineffective for failing to adequately cross-examine
> witnesses.
>
> f.   Trial counsel was ineffective for failing to properly investigate and
> present mitigation evidence.
>
> g.   Trial counsel was ineffective for failing to properly investigate and
> present mental health issues.
>
> h.   Trial counsel was ineffective for failing to inquire as to the nature of
> Petitioner's personal relationship with the victims.

Amended Petition for Post-Conviction Relief Pursuant to Rule 37.5 A.R.Cr.P., p. 4.   The

state trial court denied those claims, specifically stating:

> c-h.   Petitioner claims his attorneys were ineffective for: being impaired,
> failing to properly investigate, failing to properly cross-examine witnesses,
> and failing to inquire as to the nature of petitioner's relationship to the
> victims.   ***The court finds petitioner introduced no evidence in support
> of these claims.***   To the contrary, the court finds that petitioner's attorneys
> did in fact adequately investigate the issues petitioner cites and adequately
> cross-examine witnesses.

Order of the Circuit Court of Sevier County, Arkansas, dated February 1, 2010, p. 5-

6(emphasis added).   The Court notes that the Eighth Circuit has held:

> A petitioner must present 'both the *factual and legal* premises' of his claims
> to the state courts in order to preserve them for federal habeas review.
> This standard applies to claims that trial counsel has been constitutionally
> ineffective.   A habeas petitioner who asserts only broadly in his state
> petition for relief that his counsel has been ineffective has not immunized
> his federal habeas claim's specific variations from the effects of the state's

39

procedural requirements.   Nor has a petitioner who presents to the state courts a broad claim of ineffectiveness as well as some specific ineffectiveness claims properly presented all conceivable specific variations for purposes of federal habeas review.

Flieger v. Delo, 16 F.3d 878, 884-85 (8th Cir. 1994)(emphasis in original)(citations omitted).[14]   The Court has thoroughly reviewed the Rule 37 petition, the transcript of the Rule 37 hearing, and the findings of the state court in that regard.   The petition sets forth bare bones, boilerplate allegations of ineffective assistance of trial counsel.   Although the evidence presented at the hearing possibly *skimmed* the issues, the state court specifically noted that *no evidence* was presented regarding those claims.   The Court, therefore, finds that post-conviction counsel *failed* to effectively raise the claims listed in Appendix A in the initial state Rule 37 proceeding.   Accordingly, the Court will proceed with its evaluation of the claims under Martinez and Trevino.

### 2.  Do the Claims Merit Relief?

The Court must next consider several factors to determine whether the claims merit relief.   Specifically, the following questions must be considered:

- Did Thomas's trial counsel meet "the constitutional minimum of competency" with respect to the claims set forth in Appendix A?

- If Thomas's trial counsel was ineffective with respect to any of the claims, was Thomas prejudiced by the deficiency during either the guilt phase or sentencing phase of trial?

- If Thomas was prejudiced by trial counsel's ineffectiveness, was post-conviction counsel ineffective for failing to assert the claim in the first instance?

---

[14] "[A] claim has not been fairly presented to the state courts unless the same factual grounds and legal theories asserted in the prisoner's federal habeas petition have been properly raised in the prisoner's state court proceedings."   Krimmel v. Hopkins, 56 F.3d 873, 876 (8th Cir. 1995).

The alleged ineffectiveness of counsel, both that of Thomas's post-conviction counsel and Thomas's trial counsel, is viewed under the Strickland standard. Strickland v. Washington, 466 U.S. 668 (1984). Pursuant to Strickland, the "proper standard for attorney performance is that of reasonably effective assistance . . . . reasonableness under prevailing professional norms." Id. at 687-88. "Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Further, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." Id. at 693. "The defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Id. at 695.

The evidentiary hearing in this case consisted of the Petitioner's presentation of the testimony of twenty-one (21) witnesses, Respondent's cross-examination of those witnesses, and presentation of one (1) witness for the Respondent. Included in the Petitioner's presentation were Pam Welling Smith, Carol Holloway, Lou Marczuk, and Tammy Harris, whose testimony centered on the trial team's representation of Mr.

41

Thomas.   The testimony of Jeff Harrelson and Jason Horton was also presented, as they represented Mr. Thomas during the post-conviction period.   Adrian Wooten, Tyron Thomas, Calvin Marshall, Zonzurea Thomas, Samritha Sanchez, Robert Marshall, Earnestine Thomas, Hazel Thomas, and Creola Cotton were presented – these witnesses are either family members or friends of Mr. Thomas and largely testified concerning Thomas's childhood and life experiences, family background, and general behavior.   The Petitioner also presented Richard Branch, who served as a juror and testified concerning his experience during the trial.   Dr. Richard Livingston testified concerning his evaluation of Thomas prior to trial and his testimony at trial.   Medical experts Dr. Ruben Gur, Dr. David Lisak and Dr. William Logan were presented and testified concerning the effects Thomas's childhood experiences and trauma had on him, the effects of drug use and toxic chemicals on Thomas's brain, and Thomas's mental state, limitations, and impairments.   Finally, expert witness Sean O'Brien testified concerning the prevailing professional norms and standard of performance required of Thomas's trial and post-conviction counsel.   The Respondent presented the testimony of Melody McKnight, who served as the jury foreman during Mr. Thomas's trial, concerning her experience as a juror during Thomas's trial.   Voluminous documentary evidence was also received by the Court.

### a.   Juror Misconduct

Three of the claims set for consideration at the hearing (Issue 1-11, Point 10-2-2, and Issue 13-2) concern the failure of trial counsel to raise claims of jury misconduct. Thomas asserts that constitutionally competent trial counsel would have raised claims of juror misconduct during the guilt, penalty, and post-trial period of trial, and that Thomas

was prejudiced by trial counsel's failure to raise those claims.    Specifically, at the hearing, Thomas focused his claims on the argument that jurors were exposed to pre-trial prejudicial publicity and that certain jurors, including Richard Branch, received, either prior to or during the trial, extraneous information concerning criminal conduct in Oklahoma of which Thomas has been accused but has not been convicted. Although the fact that Thomas was convicted of a prior violent felony in Oklahoma *was* introduced into evidence during the trial, this more recent alleged criminal conduct, which includes a murder charge, was not presented to the jury.

As conceded by counsel for the Petitioner during the post-hearing arguments held on March 8, 2017, the evidence presented at the hearing simply does not support this allegation or *any* of the juror misconduct allegations contained in Thomas's petition. Richard Branch clearly testified that he knew of the prior criminal activity *admitted into evidence*, but that *he did not know* of the alleged more recent criminal activity of Thomas in Oklahoma during the trial.    Branch pointed out that had he known about those things during the trial phase, that information would have been contained in his notes from the trial.    Although, as Thomas points out, Branch's written declaration and deposition testimony could be viewed as contradictory to Branch's hearing testimony, Branch explained that after reviewing his notes he was sure that he had no knowledge of the recent alleged criminal conduct until *after* the trial.

Based on this testimony, the testimony of Melody McKnight, and the Petitioner's concession, the Court finds no facts to support Thomas's claims that trial counsel was ineffective in any manner with respect to alleged juror misconduct. The Court, therefore,

finds that <u>Martinez</u> and <u>Trevino</u> do not excuse the procedural default of Issue 1-11, Point 2-2-2 or Issue 13-2.

### b.   Mental Health and Mitigation Evidence

The remaining claims arise from the alleged failure of trial counsel to present compelling mental health and mitigation evidence during trial.   Point 1-5-1, Issue 1-13, and Issue 1-14 are claims which concern the guilt phase of Thomas's trial.   Issue 10-1 concerns the sentencing phase of trial.

Initially, the Court notes that during the March 8, 2017 post-hearing arguments, Petitioner's counsel conceded that the proof presented at the hearing did not support Issue 1-13 or Issue 1-14.   The Court agrees.   In Issue 1-13 of his petition, Thomas argues that his trial counsel was ineffective in that counsel failed to protect Thomas's constitutional rights against self-incrimination, his right to counsel, and his right of due process when counsel failed to fully litigate and preserve Thomas's motion to suppress his statements to police.   In Issue 1-14 of his petition, Thomas argues that his trial counsel was ineffective, in violation of the Sixth Amendment to the Constitution, in that they failed to argue that he was incompetent to stand trial.   No evidence was presented directly regarding the suppression of Thomas's statements to the police; and, while Thomas presented some evidence and argument with respect to his competency to stand trial, there was significant proof that Thomas was cooperative and helpful to his trial counsel and understood the proceedings against him.   Because the Court finds no merit to these claims, and considering the Petitioner's concession with respect to the claims, the Court finds that the procedural default of Issue 1-13 and Issue 1-14 are not excused by <u>Martinez</u> and <u>Trevino</u>.

44

### i.   Evidence Presented at the Evidentiary Hearing

The remaining two claims include Point 1-5-1 and Issue 10-1.   In Point 1-5-1 of his petition, Thomas argues that trial counsel was ineffective during the guilt phase of trial, in violation of the Sixth Amendment, because counsel failed to effectively argue that Thomas did not act with the requisite premeditation and deliberation for capital murder. Thomas argues that trial counsel should have bolstered this mental state argument by presenting effective mental health evidence, including evidence and expert testimony of dissociation disorders from which Thomas allegedly suffered.

Issue 10-1 of Thomas's petition asserts that trial counsel was ineffective at the penalty phase of trial with respect to their presentation of the case in mitigation.   Thomas argues that trial counsel failed to conduct a thorough investigation with respect to mitigation and could have presented documentary evidence and testimony from lay and expert witnesses that could have changed the jury's decision when weighing the aggravating circumstances against the mitigating circumstances at sentencing. Specifically, as included in Issue 10-1, Thomas argues that, with respect to mitigation evidence, trial counsel:

- failed to present readily available documentary evidence (Point 10-1-1);

- failed to present available mitigation testimony from lay witnesses (Point 10-1-2);

- failed to present testimony from a trauma expert (Point 10-1-4);

- failed to present evidence of a psychotic disorder (Point 10-1-5);

- failed to present evidence of major depressive and anxiety disorders (Point 10-1-6); and,

- failed to present evidence of sexual abuse (Point 10-1-7).[15]

At the hearing, Thomas presented extensive mental health and mitigation evidence which was not effectively introduced at trial.   Mickey Thomas was raised in a family that was dysfunctional at best.   Alcohol abuse, drug abuse, physical abuse, and violence were prevalent among Thomas's mother, father, step-father, and grandparents.   Thomas was born pre-mature, having been exposed to alcohol and drug use *in utero*.   Thomas learned illicit behavior early on, and reportedly began huffing gas as a toddler. This behavior, almost certainly learned from the observation of his parents, on more than one occasion as a 3-4 year old child caused him to become unconscious, with his mother reporting that he had to be "brought . . . back to life".   Thomas witnessed domestic abuse between his mother, father, and mother's boyfriends, and between his maternal grandparents.   Thomas also personally experienced verbal and physical abuse from his mother, father, and his mother's boyfriends – the physical abuse including being tied up and beaten on multiple occasions.

In addition to being riddled with drug, alcohol, verbal, and physical abuse, Thomas's childhood was permeated by poverty.   Evidence was presented that, as a child, Thomas, on occasion, stole food, clothing, and shoes to provide for his mother and siblings.   Running water was occasionally not present in Thomas's childhood home; accordingly, hygiene was poor.

Thomas's social history contains a strong family and personal history of mental health issues.   Introduced into evidence at the hearing were voluminous Oklahoma

---

[15] Point 10-1-3 of Thomas's petition asserts that Thomas's counsel was ineffective for failing to present evidence of epilepsy during in mitigation.   This point has been withdrawn by Thomas.   (Reply to Response to First Amended Petition, Doc. 29, p. 8).

Department of Human Services records.   The records were never introduced or even obtained by Thomas's trial counsel.   The DHS records show that social services in Oklahoma supported Thomas's family for extended periods of time, with services including welfare assistance, food stamps, and housing subsidies.   The records show that Thomas's mother abandoned the family for a period of months when Thomas was very young.   The records also show that Thomas was transferred to foster care on at least two occasions – with one occasion lasting at least a year.

From the age of 18 until 27, Thomas was in prison in Oklahoma.   During that time he received mental health services.   Following his release from prison, he obtained a job and got married.   However, in 2004, Thomas began having marital problems and lost his job.   Thomas asked family members for mental health help and sought mental health services not long before the murders.

Thomas presented the testimony of Dr. Richard Livingston at the evidentiary hearing.   Dr. Livingston was retained as an expert in Thomas's trial and testified for Thomas during the sentencing phase of trial.   Although at trial Livingston testified concerning the risk factors present for Thomas stemming from his exposure to toxins and low birth weight, Livingston testified that if asked he could have performed an evaluation for trauma or dissociation.

As stated above, Dr. Ruben Gur, Dr. David Lisak and Dr. William Logan provided expert medical testimony for Thomas during the evidentiary hearing.   Dr. Gur concluded that Thomas suffered brain damage, both structural and functional, but did not conclude as to the effect that brain damage had on Thomas.   Dr. Lisak testified that Thomas experienced extensive trauma during his childhood, including both physical abuse and

47

sexual abuse.   Lisak also noted that Thomas was exposed to significant violence in his home, and that, due to these traumas, he suffers from symptoms of posttraumatic stress disorder and displays dissociative symptoms; but, Lisak stopped short of formulating a specific diagnosis with respect to Thomas.   Dr. William Logan testified as an expert in forensic psychiatry.   Logan ultimately concluded that Thomas was suffering from dissociation including a "depersonalization disorder with some symptoms of depersonalization, derealization, some spotty amnesia, [and] some identity problems". Logan also opined that Thomas's dissociation disorder prevented him from having adequate cognitive control over his actions and behavior "at certain points in [the] offense" and "prevented him from being able to premeditate or deliberate about his actions in the cause of the death of the two victims."

### ii.    Effect on Guilt and Sentencing Phase / Prejudice

With respect to the guilt phase of trial, the Court finds that there is no reasonable probability that the evidence presented would have made any difference on Thomas's guilt or innocence of capital murder.   The Court simply does not believe that even if presented, there is a reasonable probability that the jury would have found that Thomas lacked the mental capacity to act with a premeditated and deliberate purpose.   The trial record is replete with evidence which supports the necessary *mens rea* for capital murder. Further, even if the expert testimony as presented at the hearing was found to be admissible with respect to whether Thomas exhibited a culpable mental state,[16]  the Court simply finds the science behind Thomas's experts' opinions speculative, far-fetched, and unbelievable with respect to *mens rea.*

---

[16] *See* Stewart v. State, 870 S.W.2d 752 (Ark. 1994).

The prejudicial effect on the sentencing phase is a much different question.   As set forth above, the picture painted in mitigation at the evidentiary hearing was compelling.   "[T]he Constitution requires that the sentencer in capital cases must be permitted to consider any relevant mitigating factor."   Porter v. McCollum, 558 U.S. 30, 42 (2009).   And, the Constitution requires that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor."   Eddings v. Oklahoma, 455 U.S. 104, 112 (1982).   "'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse.'"   Penry v. Lynaugh, 492 U.S. 302, 319 (1989)(abrogated on other grounds)(quoting California v. Brown, 479 U.S. 538, 545 (1987)).   Considering the totality of the circumstances, the Court finds that Thomas was prejudiced as the case in mitigation presented at the hearing supports a reasonable probability of a life sentence when weighed against the aggravating circumstances presented at trial.

### iii.   Was Trial Counsel Ineffective?

In addition to the mitigation evidence introduced at the hearing, Thomas introduced evidence concerning trial counsel's performance during their representation of him. From the evidence presented, trial counsel consisted of a team which was unquestionably experienced, but, the Court finds, was dysfunctional and disjointed during Thomas's representation as related to the development and presentation of mitigation evidence. For whatever reason, the trial team unquestionably failed to conduct a thorough investigation with respect to mitigation.   Lou Marczuk was lead counsel, and focused on

49

the guilt portion of Thomas's trial.   Tammy Harris was assigned to the case in mitigation. Although the team included a "mitigation specialist" and a paralegal, those individuals did not work independently, but rather at the direct direction of the attorneys.

Trial counsel initially reached out to Thomas's family at the beginning of their representation, securing rich information through a written questionnaire completed by Thomas's mother, but follow up was lacking.   Important documentary evidence prompted by that questionnaire was either not gathered in a timely manner or not gathered *at all*. The evidence presented during this Court's evidentiary hearing included extensive Oklahoma DHS records, Oklahoma department of corrections records, medical records, employment records and school records.   Under the required standard of care established by Strickland, and as evidenced by the American Bar Association Guidelines and case law, these records should have been collected and thoroughly reviewed early in the case to determine arguments in mitigation and potential mitigation witnesses. Wiggins v. Smith,  539 U.S. 510, 533-34 (2003); American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7 (Rev. ed. 2003).   This documentation would also have provided potential mental health expert witnesses with necessary background for effective expert testimony. Not only did trial counsel fail to obtain this information, as set forth above, trial counsel was on notice of the existence of most of this information due to the initial questionnaire completed by Hazel Thomas.

Few mitigation witness interviews were conducted; and, many of the mitigation witness interviews that were conducted occurred just prior to trial.   In addition, many of

the mitigation witness interviews were conducted ineffectively, either with multiple parties present or over the telephone.

The fact that trial counsel was grossly unprepared is further evidenced by their own admissions in the motions for continuance presented prior to trial. Specifically, the second motion for continuance, filed on September 7, 2005, just days before the start of trial, notes the Constitutional requirements of trial counsel in a death penalty case, stating: "Since a person's life is at stake, counsel is required to exhaustively explore every factual and legal aspect of the 'defendant's character . . . and any of the circumstances of the offense.' Lockett v. Ohio, 438 U.S 586, 604 (1978)." Trial counsel further cited Rompilla v. Beard, and noted that counsel needed "time to fully gather, properly analyze, and prepare the mitigation evidence." Rompilla v. Beard, 545 U.S. 374 (2005)(finding counsel is bound to make reasonable efforts to fully investigate the case in mitigation through multiple avenues). Specifically, the second motion for continuance states:

> It is vitally necessary that Defendant be allowed additional time to prepare for trial. Witnesses need to be interviewed in preparation of Defendant's defense. Each of these witnesses are either listed in the State's file or have been developed through partial investigation of Defendant's case. Counsel would be grossly negligent if these witnesses are not interviewed before trial. Interviewing these witnesses will allow counsel to develop trial strategy, prepare cross-examination, and allow Defendant to present a credible and competent defense. In addition, the records that counsel has requested will assist Defendant in preparing a mitigation presentation. These records provide Defendant with information regarding the services provided to him and his family, observations and notes made by teachers, caseworkers, investigators, and judges, and actions taken by these same people towards Defendant and his family. This information is relevant as mitigation evidence to show a jury the Defendant's life history, family dysfunction, mental and emotional trauma, and ultimately to show why the Defendant should not die at the hands of the State.

The motions for continuance, presented by Tammy Harris during a pre-trial hearing, were denied.[17]   However, unrebutted testimony was presented at this Court's evidentiary hearing that---during off record conferences between counsel and the trial judge---the judge informed counsel that he would, in fact, grant a continuance, but only if Marczuk, lead counsel, requested one.   Marczuk was, according to the testimony, informed of the judge's position.   Harris insisted the mitigation case was not prepared and assumed Marczuk would agree to see the judge to facilitate a continuance. However, without discussing the matter further, Marczuk chose to proceed to trial.[18]

The result of trial counsel's lack of investigation and preparation was an entirely unconvincing case in mitigation, that failed to tell Thomas's whole life story.   Thomas's experts in mitigation relied on inaccurate and incomplete background information.   Trial counsel presented a total of three, rather insignificant, single page documents into evidence for jury consideration.   The family members and other lay witnesses that did testify were unprepared and underutilized.

Much argument has been made about the reasonableness of trial counsel to proceed to trial and the decision to hold back on certain mitigation evidence for fear of "opening the door" with regards to the Oklahoma crimes which Thomas is alleged to have committed.   The Court acknowledges that such considerations are important.   Although strategic choices are given deference, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."   Strickland, 466 U.S. 668, 691

---

[17] Lead Counsel, Lou Marczuk, did not attend this hearing.
[18] Testimony of Tammy Harris, January 30, 2017 Evidentiary Hearing, Volume 3, p. 368; 378-386; Volume 4, p. 777; 788-797.

(1984).   As further set forth by <u>Strickland</u>, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."   <u>Id</u>.   Here, the Court finds that this strategic argument simply cannot neutralize a lack of preparation.   Not only did trial counsel fail in one of the most important aspects of their job---discovering and developing mitigating circumstances for presentation to the jury---but trial counsel utterly failed to investigate the facts of the accused crimes that Respondent now argues were strategically kept from the jury.

For all of these reasons, the Court finds that trial counsel was constitutionally ineffective with respect to their presentation of the case in mitigation.   And, as discussed above, Thomas was prejudiced by this failure.

### iv.    Was Post-Conviction Counsel Ineffective?

From the evidence presented, the Court finds that post-conviction counsel did very little preparation with respect to Mr. Thomas's case beyond reviewing the trial and appellate court record.   Post-conviction counsel performed very little, if any, review of the 19 bankers boxes which made up trial counsel's collective file.   Post-conviction counsel did not request funding for an investigator or a mitigation specialist. Post-conviction counsel did not consult with experts or interview mitigation witnesses.   In fact, post-conviction counsel failed to conduct any timely or meaningful interviews of trial counsel in preparation for the Rule 37.5 hearing.   Despite the fact that the continuance motions served as a literal road map to making a case for ineffective preparation of the mitigation case, post-conviction counsel demonstrated little or no interest in pursuing it.   In fact, post-conviction counsel actually testified that they viewed their main role as preserving issues for federal review.   The Court does not entirely understand what that means, but

it most certainly cannot excuse their failure to investigate any issues outside the four corners of the court record, nor can it excuse their failure to present readily available evidence in support of a claim they specifically recited as a premise of the Rule 37.5 petition.

Again, with respect to post-conviction counsel, under Strickland, the proper standard "is that of reasonably effective assistance. . . . reasonableness under prevailing professional norms."  466 U.S. at 687-688.  Clearly, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Id. at 691.  The Court finds that under prevailing standards post-conviction counsel has the same duties as trial counsel with respect to investigation and cannot rely on the previously compiled record but must conduct a thorough independent investigation.  *See* American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.15.1 (Rev. ed. 2003).  The evidence before the Court is overwhelming---not only for the reasons set forth above, but as buttressed by the testimony of Professor Sean O'Brien [19] ---that post-conviction counsel failed in meeting the minimum standard necessary to fulfill their duty.  Accordingly, the Court finds that the instant claims of ineffective assistance of trial counsel were not effectively raised during the state post-conviction proceedings, and Thomas was prejudiced as a consequence.

---

[19] Law Professor Sean O'Brien opined as to the prevailing standards and duties of post-conviction counsel.   See Document 119-5, pp. 125-132.

**D.   Actual Innocence Exception to Procedural Default[20]**

Finally, Thomas argues that he is actually innocent of capital murder.   The Supreme Court has held "'[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'"   Murray v. Carrier, 477 U.S. 478, 495 (1986)(quoting Engle v. Isaac, 456 U.S. 107, 135 (1982)).   Accordingly, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."   Id. at 496.   To qualify for the "actual-innocence gateway" to defaulted claims, Thomas must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt."   Schlup v. Delo, 513 U.S. 298, 327 (1995).   "[A] petition supported by a convincing Schlup gateway showing 'raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error,' hence, 'a review of the merits of the constitutional claims' is justified."   House v. Bell, 547 U.S. 518, 537 (2006)(quoting Schlup, 513 U.S. at 317).

Thomas argues that "for all the reasons that [he] was prejudiced by ineffective assistance of counsel . . . he would suffer a miscarriage of justice if not allowed to present his constitutional claims."   (Reply to Response to First Amended Petition, Doc. 29, p. 48). Thomas further argues that he "can establish innocence of the death penalty necessary

---

[20] Among other places, the actual innocence exception is discussed in the following pleadings: Document 29, p. 47; Document 70, p. 25; and, Document 73, p. 18.

to excuse any procedural default of Claim 18".[21]  (Brief of Mickey Thomas, Doc. 70, p. 27).   As set forth above, the Court finds Claim 18 without merit.   *See* <u>McKinnon v. Lockhart</u>, 921 F.2d 830, 833 n. 7 (8th Cir. 1990).   Further, the Court, considering the allegations, and the alleged new evidence concerning Thomas's mental disorders, does *not* find it more likely than not that *no* reasonable juror would have found Thomas guilty of capital murder.[22]   The Court finds that Thomas cannot satisfy the actual-innocence exception to excuse his procedural default.

### V.  Conclusion

For the reasons set forth above, the Court **GRANTS IN PART, AND DENIES IN PART,** the Amended Petition for Writ of Habeas Corpus (Doc. 9).   The Amended Petition is **GRANTED** with respect to Issue 10-1 because, although procedurally defaulted, <u>Martinez</u> and <u>Trevino</u> permit this Court's review, and the Court finds that Issue 10-1 is substantial and that it merits relief.   Each of the remaining claims set forth in Thomas's Petition are **DENIED**.

The Respondent is, therefore, ordered to either (1) retry the penalty phase of the case or (2) stipulate to a life sentence.   No later than **MAY 31, 2017**, the Respondent shall file a status report informing the Court of her decision.   To the extent Respondent elects to retry the penalty phase, it must do so within 180 days thereafter.

The Court further finds that reasonable judges could disagree about this Court's conclusion with respect to certain issues.   28 U.S.C. § 2253(c)(2).   The Court, therefore, grants a certificate of appealability on the following questions:

---

[21] In Claim 18, Thomas asserts that his sentences should be vacated because he suffered from severe mental disorders and disabilities at the time of the offenses.

[22] See § IV(C)(2)(b)(ii).

- Did Thomas's post-conviction counsel fail to effectively raise the instant claims of ineffective assistance of trial counsel in the initial state post-conviction proceeding?

- Was Thomas's trial counsel constitutionally defective during the guilt phase of trial, in violation of the Sixth Amendment, in that counsel failed to effectively argue that Thomas did not act with the requisite premeditation and deliberation for capital murder?

- Was Thomas's trial counsel constitutionally defective during the sentencing phase of trial, in violation of the Sixth Amendment, in that counsel failed to effectively present a case in mitigation?

**IT IS SO ORDERED** this ___31st___ day of March, 2017.

_____

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

57

## APPENDIX A

&ast;   Point 1-5-1, Failure to Support Theory of Defense with Readily Available Evidence, including the bases for this claim incorporated through Issue 10-1;

&ast;   Issue 1-13, Ineffective Assistance of Counsel with Respect to Suppression Claim, including the bases for this claim set forth under Claim 14;

&ast;   Issue 1-14, Failure to Support Claim of Incompetency to Stand Trial with Readily Available Evidence, including the bases for this claim incorporated through Issue 10-1 and Claim 15; and,

&ast;   Issue 10-1, Ineffective Presentation of the Case in Mitigation, including the bases for this claim presented in each of the Points under Issue 10-1.

&ast; Issue 1-11, Failure to Raise Claims of Juror Misconduct, including all bases for this claim incorporated through Claim 11.

&ast; Point 10-2-2, Trial Counsel Failed to Investigate for, Discover, and Present Claims of Juror Misconduct, including all bases for this claim incorporated through Claim 11; and,

&ast; Issue 13-2, Failure to Raise Claims of Jury Misconduct by trial counsel, including all bases for this claim incorporated through Claim 11.